UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20684-CR-PAS(s)(s)

UNITED STATES OF AMERICA

v.

LAZARO PRAT,

        **Defendant.**

_____/

**UNITED STATES' RESPONSE TO DEFENDANT'S GUIDELINE
OBJECTIONS AND REQUEST FOR BELOW GUIDELINE SENTENCE
AND INCORPORATED MEMORANDUM OF LAW**

Defendant Lazaro Prat has filed objections to the Pre-Sentence Investigation Report ("PSR") (DE 300). In this document, defendant asks the court to accept the parties' plea agreement regarding calculation of the loss amount and defendant's aggravating role. The United States joins in requesting that the Court accept the loss amount calculated in the plea agreement and also accept the parties agreement that the aggravating role be limited to a three level increase as manager and supervisor of the criminal offense. The United States however opposes defendant's objection to the application of the two level upward adjustment pursuant to U.S.S.G. § 2S1.1(b)(3) because the offense did involve sophisticated laundering.

Defendant also argues for a below guidelines sentence. Contrary to this request, the nature and circumstances of the offense and the history and characteristics of the defendant, as well as other §3553 factors, merit that defendant receive a severe sentence at the top of the guidelines range.

**I.    Guidelines Agreed to by the Parties in the Plea Agreement.**

The following two Guidelines were agreed to by the parties:

  **(1). Aggravating role (PSR ¶ 44).**

The United States joins defendant in requesting the Court to adopt the aggravating role adjustment negotiated by the parties. This role adjustment increases the total offense level by three levels.

  **(2). Intended Loss Amount (PSR ¶ 40).**

The United States and defendant negotiated an intended loss amount of more than $7,000,000, but less than $20,000,000. The United States joins defendant in asking that the agreement be adopted by the court. Probation is correct that the three pharmacies involved in this offense did bill Medicare in excess of $26,000,0000. However, the intended loss amount may be adjusted because Medicare does not pay the full claim amount, as there are offsets and copays which are deducted. This has been reflected by taking 80 % of the billed amount to as the intended loss amount. Another factor that impacts the intended loss calculation in this case is that one of the pharmacies, Medline, did conduct some a small amount of business as reflected by its purchase of some inventory and that the United States agreed to only use part of the billing a second pharmacy because part of the fraud in that pharmacy may not have been part of this conspiracy. In view of all this, the United States asks the Court to adopt the loss amount negotiated by the parties, that is, less than $20,000,000 but more than $7,000,000.

**II. Response in Opposition to Defendant's Objection to the Adjustment for Sophisticated Laundering (PSR ¶ 41).**

Defendant's objection to the two level enhancement for sophisticated laundering under U.S.S.G. § 2S1.1(b)(3) should be denied because the offense meets the criteria for the application of this enhancement. Sophisticated laundering means "complex or intricate execution or

concealment of the" money laundering offense. U.S.S.G. § 2S1.1, comment (n. 5 (A)). The § 2S1.1 commentary states that "[s]ophisticated laundering typically involves the use of – (i) fictitious entities; (ii) shell corporations; (iii) two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or (iv) offshore financial accounts." *Id.*

The money laundering conducted by defendant and the other conspirators clearly meets three of the four criteria for sophisticated laundering cited in the commentary. The laundering utilized at least five shell corporations (i.e., Pharmacy Services, Metro Property Development, Fishing Charters, Amerigroup Distributors, and SGL Enterprises), a construction company that did business largely with fraud proceeds (i.e., Rosy Construction), nominee owners (i.e., Eudaldo Torres), real estate transactions and a real estate lawyer, foreign bank accounts and foreign wires, and the layering of transactions through multiple accounts and entities. Indeed, the sophisticated practices employed have resulted in an inability to account for the disposal and whereabouts of significant proceeds of defendant's crimes. Defendant's objection lacks merit as just the use of shell companies, layering, and phony notations on checks, is sufficient to justify the application of the sophisticated laundering enhancement. *United States v. Galdos*, 308 Fed.Appx. 346, 363 (11th Cir. 2009).

    **1.**    **The Use of Shell Corporations.**

Defendants Prat and Lopez Prat utilized several companies to launder millions of the fraud proceeds. Five companies were shells that existed solely to launder the proceeds of the health care fraud. They existed only for a few months before the Secretary of State dissolved them for failure to file an annual report. Defendant Prat was the sole officer for three of the shell companies – These companies are Pharmacy Services, Inc. ("Pharmacy Services"), Metro Property Development

3

("Metro Property"), and Fishing Charters, Inc. ("Fishing Charters").[1]  Through these companies, defendant Prat opened and controlled several bank accounts that he used to launder the proceeds.

Defendant's claim that the money was laundered through legitimate businesses and accounts is simply wrong.  The laundering of the funds through the shell companies is clear.  For example, defendant Lopez Prat wrote Pharmacy Services approximately $1.7 million in checks drawn on Medline Pharmacy's designated Medicare account from approximately July 2005 through October 2007.  The checks were signed by defendants Prat and Lopez Prat.  Pharmacy Services received approximately $946,000 in checks drawn on Advanced Pharmacy's Medicare account from January 2006 through March 2008.  The checks were signed by defendants Prat and Torres.  Defendant Prat deposited the checks from Medline and Advanced Pharmacy into three Pharmacy Services bank accounts at three different banks.  *See,* Exhibit 1 (summary chart for Pharmacy Services).  The company and bank accounts served only to launder the fraud proceeds.  Other than the Medline and Advanced Pharmacy funds, deposits into the three Pharmacy Services accounts were negligible and do not reflect any business activity.  Defendant Prat moved the fraud proceeds out of the Pharmacy Services accounts through checks that he signed, bank cashier checks, and wire transfers.

Defendants Prat and Lopez Prat utilized Metro Property Development and Fishing Charters

---

[1] Defendant Prat incorporated Pharmacy Services, Inc., Metro Property Development, Inc., and Fishing Charters of Miami, Inc., and was the president and sole owner of these companies.  These Florida corporations were located at 1442 SW 93rd Place, Miami, Florida, 33174, which is the residence of defendant Prat. Prat was registered agent, president and director of Pharmacy Services from June 2005 through September 2006.  Prat was president and director of Fishing Charters from its founding in April 2006 through September 2007.  Prat was president of Metro Property from its founding in December 2006 through September 2008.  These companies were each dissolved by the state for failure to file an annual report.  Of these companies, only Metro Property filed a single tax return, and that return only reported interest income on a certificate of deposit.  There is no evidence that any of these three companies conducted any legitimate business.

to launder funds in the same manner as described above for Pharmacy Services. From approximately May 2006 through June 2007, Fishing Charters received $441,000 in checks drawn on Medline's Medicare account. From approximately January 2006 through March 2008, Fishing Charters received $541,000 in checks drawn on Advanced Pharmacy's account. The checks were signed by defendants Prat, Lopez Prat, and Torres. Funds deposited into Fishing Charter's account in Regions Bank stayed there only for a few months. By September 2007, defendant Prat had emptied the account by moving the funds to personal and business accounts, to a real estate attorney ($300,000), cash withdrawals (about $42,000) and to himself $143,000. *See,* Exhibits 2 and 3 (summary charts for Metro Property and Fishing Charters).

Two additional shell companies used to launder funds were controlled by two other conspirators who established corporate bank accounts that were used to negotiate checks and withdraw the funds. Defendant Josue Fernandez had been helping Prat launder fraud proceeds through checks from the pharmacies written to Fernandez personally.[2] In July 2006, Fernandez founded Amerigroup Distributors, Inc. ("Amerigroup"), at the behest of defendant Prat. Similar to Pharmacy Services, the Amerigroup company name was chosen to create the image of a legitimate supplier of inventory or services to the pharmacies so as to not raise suspicion. Amerigroup did not conduct any legitimate business, but only served as a shell for laundering the Medicare fraud proceeds. Amerigroup Distributors received approximately $75,000 in funds from Advanced Pharmacy and approximately $342,000 from Medline Pharmacy. *See,* Exhibit 4 (summary chart for Fernandez and Amerigroup Distributors). Fernandez later returned the proceeds to defendant Prat

---

[2] Fernandez received approximately $223,000 in funds from Medline Pharmacy from September 2004 through September 2008. He also received approximately $40,000 in funds from Advanced Pharmacy from January 2006 through March 2008.

in cash minus Fernandez's fee, thereby concealing the true nature, origin, and ownership of the fraud proceeds.

The fifth shell company identified was controlled by Silvia Garcia, defendant Prat's aunt. Like Fernandez, Garcia had been cashing checks from the pharmacies for defendant Prat. Garcia formed SGL Enterprises in September 2006 at Prat's suggestion so that she could open a corporate bank account. Thereafter, approximately $165,000 in fraud proceeds from the pharmacies was deposited into the SGL Enterprises corporate account. Garcia then withdrew the funds and gave the money to Prat in cash, minus her commission. *See*, Exhibit 5 (FBI 302 interview of Garcia and summary chart). Contrary to defendant's claim in his objection, this activity concealed the true ownership of the funds (DE 300: 4). Many of the checks had made up invoice numbers written in the memo line so as to appear to be business related. *See*, Exhibit 6 (sample checks to Garcia and SGL Enterprises). *United States v. Galdos*, 308 Fed.Appx. 346, 363 (11th Cir. 2009)(citing use of false notations on checks as factor supporting enhancement). In reality, SGL Enterprises did not conduct legitimate business but only served as a shell company to launder the fraud proceeds.

**2.     Layering of transactions.**

The laundering offense by defendant Prat is characterized by layering and multiple movement of funds. Defendant Prat also laundered funds through a construction company he controlled, Rosy Construction, Inc. ("Rosy Construction"). Prat also used Rosy Construction and the shell companies he controlled to launder the fraud proceeds through a series of layered transactions moving the money moneys among the different companies, among different accounts and among different banks. The layering included use of certificates of deposit, cash, and cashier's checks, thereby making it more difficult to trace the funds.

Rosy Construction alone had three accounts in Bank of America. Defendant Prat and Gladis Garmendia were the account holders of these accounts. Deposits into one of these accounts totaled approximately $3,654,000 from November 2004 through October 2010, which are traceable to the fraud. Deposits into one of these accounts totaled approximately $3,654,000 from November 2004 through October 2010. These funds were moved in series of transactions, bank checks, among different accounts. The source of the funds, with approximate amount in parentheses, included the following: a Rosy Construction certificate of deposit ($1.8 million), Prat personal accounts ($760,000), cash deposits ($497,000), Gladis Garmendia ($200,000) which funds she received from the fraud pharmacies, Wachovia Bank official checks ($130,000), Metro Property Development ($112,000) which was , and defendant Lopez Prat ($50,000). This layering of transactions makes it difficult to trace the funds. *See,* Exhibit 7 (Rosy Construction summary chart). Thus, it is one of the aspects that make this offense conduct sophisticated laundering.

Rosy Construction also held a certificate of deposit (CD) in the amount of approximately $1,046,000.00. The sources of the funds in the CD were $300,000 from PRAT, and a $700,000 check drawn on a Rosy Construction Bank of America account. Of these funds, some are not traceable because they were cash deposits. However, those funds that could be traced were traced to the Medicare fraud pharmacies, but often only after working through layers of other accounts.

**3.   Use of real estate transactions and construction to launder funds.**

Defendant Prat and Lopez Prat used real estate transactions and a real estate lawyer to launder the funds. Real estate was purchased with fraud proceeds, then the proceeds were made liquid again through lines of credit secured by the equity in the properties. *See*, Exhibit 8 (balance statements of line of equity accounts on two forfeitable properties). This use of real estate to clean and hide the

fraud proceeds is sophisticated.

Defendant Prat used Rosy Construction to land . Prat built a shopping center at 8040 95th Stree, Hialeah Gardens, with fraud proceeds. Prat owned the shopping center, which is listed for forfeiture, through a holding company named West Garden Investments, LLC, thereby further obscuring his ownership of the property. Prat paid the construction company and materials in checks drawn on a Rosy Construction account, from the pharmacies, and in cash payments totaling $175,000. The source of the cash cannot be determined. However, such large cash payments are certainly part of the large amounts of fraud proceeds converted into cash that the location of which is not known.

Contrary to defendant's claim that he did not use lawyers accounts (DE 300: 4), Prat laundered significant funds through a real estate lawyer. *See*, Exhibit 9 (Attorney Ziegenhirt flow chart). Prat used these funds to purchase real estate, and later obtained lines of credit so as to make the funds liquid again thereby laundering the true source of the funds. Prat also used the real estate lawyer to receive fraud proceeds, deposit them into his trust account, and then return funds to him in checks which Prat deposited into his personal account. *See*, Exhibit 10 (sample checks totaling $165,000 from Carlos Ziegenhirt P.A. to defendant Prat and corresponding deposit slips).

**4.     Use of Offshore Accounts.**

Contrary to his objection, defendant Prat did use offshore accounts and international wires to launder the fraud proceeds. We have evidence that Prat wired $55,000 to bank accounts in the Dominican Republic and Panama. The funds came from the pharmacies, through Metro Property Development. This shows that Prat was using international bank accounts and wires, which is one of the criteria cited in the application notes. *See*, Exhibit 11 (international wires).

Defendant's argument that for the sophisticated laundering to apply, the laundering must be complex in comparison with the "garden variety" laundering. Defendant is incorrect as the neither the guideline nor the case law support this view. Defendant citation of *United States v. Hance*, 501 F.3d 900 (8th Cir. 2007), to suggest that the money laundering offense conduct must be "more intricate than the garden variety . . . scheme" is misplaced (DE 300: 4). *Hance* interpreted the sophisticated means enhancement under the 1998 fraud guideline, U.S.S.G. § 2F1.1, not the sophisticated laundering adjustment in today's 2S1.1. *Id.* at 909. In *Hance*, the court noted that the application note stated that the scheme had to be "especially complex or especially intricate." *Id.* Similar language does not appear in the Guidelines commentary to sophisticated laundering adjustment under § 2S1.1. The commentary of § 2S1.1 cites examples of factors which support the application of the enhancement. The Court should deny defendant's objection because the Guideline factors present in this case (i.e., use of shell corporations, layering of transactions, transactions intended to appear legitimate, and offshore financial accounts) and other factors (e.g., use of real estate lawyer, real estate transactions, nominee owners, and certified checks) support a finding that the laundering was sophisticated.

**III.     Factual Background and § 3553 Factors**

This Indictment arises out of defendant Lazaro Prat owning and controlling three pharmacies that defrauded Medicare in the years 2003 through 2008. In June, 2003, Lazaro Prat registered with the State of Florida as president of Advance Medical Equipment, the first pharmacy. However, by July 2004, Prat looked for other persons to be nominees. Prat convinced Josue Fernandez to be president of Advance Medical Equipment. Prat remained as vice-president. Advance Medical

Equipment billed Medicare approximately $3.9 Million and was paid about $560,000.³

One reflection of defendant Prat's character is that he involved those closest to him in his crimes. Prat turned to co-defendant Lopez Prat, his then girlfriend now wife, to open Medline Pharmacy. Lopez Prat ran Medline from August 2004 through July 2008. Medline caused by far the most losses to Medicare out of the three Prat pharmacies. Medline billed about $16.6 Million and was paid approximately $10.6 Million. However, Prat was not satisfied with this high level of thievery. Prat talked Edualdo Torres, his mother's boyfriend, to open Advance Pharmacy in January 2006, a time when Medline was at the peak in defrauding Medicare. Torres is a simple man of low education, so Prat offered Torres several hundred dollars a week to be nominee owner of Advanced Pharmacy. Prat did everything from open bank account, to applying to Medicare, to perpetrating the fraud at Advanced Pharmacy. Advanced Pharmacy was dissolved in 2008. During the time it was opened, Prat used Advance Pharmacy to bill Medicare for approximately $6.2 Million and was paid about $4.2 Million. This was almost complete fraud, as Advanced Pharmacy purchases of inventory were negligible.

Prat involved his mother, Gladis Garmendia, in the laundering the fraud proceeds. Garmendia received several hundred thousand dollars and bought an apartment at 900 Biscayne Boulervard, a luxury building in downtown,with fraud proceeds. Prat gave his mother fraud proceeds to use to pay the maintenance and mortgage on this apartment. However, this purchase was not a gift as Prat was merely using his mother as a nominee owner. It was Prat and Lopez Prat who were residing at the luxury apartment at the time of their arrest. Prat also involved his aunt, Silvia

---

³ Prat has contested that he was not involved with Advance Medical Equipment during the whole time it operated. However, even granting this argument, Advance Medical Equipment billed about $667,000 and was paid about $176,000 during the time period Prat admits (January 2003 through June 2004).

Garcia in the scheme. *See,* Exhibit 5 (FBI 302 interview of Silvia Garcia).

Defendant Prat's history also merits a severe sentence. Defendant Prat was defrauding Medicare as far back as 1999. *See*, Exhibit 12 (FBI 302s from 1999 and 2000 describing source information identifying Prat and undercover meetings with Prat). Prat had two DME pharmacies at that time – Garmendia Pharmacy and MEDCO. Prat was identified by a confidential informant as a person committing Medicare fraud in 1999. Thereafter, Prat was recorded by an undercover FBI agent negotiating to purchase Medicare information that would be used to commit fraud. The investigation did not reach a point where Prat was charged. However, the evidence gathered does establish by a preponderance standard that Prat was involved in Medicare fraud in 1999 and 2000.

Defendant Prat has not come forward to help the United States locate any proceeds of his crime. Through financial investigation, the United States will be able to recover assets which represent funds stolen by defendant Prat and the other conspirators. However, All assets forfeited in this case were identified without defendant's assistance. Defendant has not volunteered $1 in restitution or forfeiture. Prat has only given up the right to litigate forfeiture of assets and even this is not a significant aid as Prat did not give up any meritorious claim. Moreover, when given an opportunity months ago to put the rent proceeds of a shopping center named in the forfeiture bill of particulars (8040 NW 95th Street) in escrow until the forfeiture issue could be resolved, defendant Prat refused. Prat also had the 900 Biscayne apartment rented out after his arrest, keeping the rent. Thus, defendant Prat has continued to benefit financially from his crime while the case was pending by receiving several thousand dollars in rent each month from the shopping center.

The nature of the offense and need for deterrence also calls for a severe sentence. The Medicare fraud involved in this case spanned more than four years. Defendant utilized three

pharmacies owned in the name of co-conspirators and several other companies to carry out his criminal scheme. Defendant recruited others into his criminal scheme, including his now-wife (co-defendant Lisette Lopez Prat), his then friend (co-defendant Josue Fernandez), and members of his family. However, defendant made sure to keep most of the fraud profits in his own control and in control of his immediate family. Defendant now claims that he now has no funds other than what the U.S. has been able to identify for forfeiture. In his PSR, Prat claims that he had no funds secreted, no foreign bank accounts, and no funds controlled in through other persons. Prat's claim that all his assets have been identified and he has no other assets is questionable in view of the amount of fraud proceeds that remain unaccounted and the fact that Prat did not disclose that he wired money to foreign bank accounts.

**IV.     Conclusion.**

The United States submits that defendant's objections to the PSR should be denied in part and granted in part. As to the sentence, the United States submits that defendant's offense conduct, the need for deterrence, and his character and history warrant a severe sentence of incarceration at the upper reaches of the guideline range.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:     s/Eric Morales
        Eric E. Morales
        Assistant United States Attorney
        Court No.  A5500886
        99 N.E. 4th street
        Miami, FL 33132
        Telephone: (305) 961-9085
        E-mail: eric.morales@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I electronically filed the foregoing document with the Clerk of the Court using CM/ECF this December 15, 2012.

s/Eric Morales
Assistant United States Attorney
